UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JAMES MAJOR McCOY | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:23-cv-358 |
| | § | |
| | § | |
| UPSHUR COUNTY, TEXAS | § | |
| | § | |
| Defendant | § | <u>JURY TRIAL DEMANDED</u> |

## ORIGINAL COMPLAINT

Plaintiff James Major McCoy, for his Complaint against Defendant Upshur County, Texas, would show as follows:

### I.

### PARTIES

1. Plaintiff James Major McCoy is an individual employed by Upshur County.

2. Defendant Upshur County, Texas, is upon information and belief, a County in Texas and may be served with summons and this Complaint through the Texas Secretary of State's office at 1019 Brazos, Room 105, Austin, Texas 78701, or wherever found.

### II.

### JURISDICTION AND VENUE

3. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 based on Plaintiff's claims of discrimination and retaliation under 42 U.S.C. § 1981.

4. This Court has jurisdiction over this action under 28 U.S.C. § 1391 based on all events and omissions underlying Plaintiff's claims occurring in this District and Division.

## III.

## FACTS

5. Plaintiff is a white male employed by Upshur County.

6. Plaintiff's wife is a black female.

7. Plaintiff was called a "nigger lover" by his fellow employees of Defendant on different occasions.

8. Employee Michael Keith ("Keith") repeatedly used the word "nigger" in front of Plaintiff.

9. Another employee named Gary Jackson told Keith not to say "nigger" in front of Plaintiff because Plaintiff was married to a black woman.  Keith ignored him.

10. Plaintiff told Keith that Plaintiff's wife was black, and Plaintiff told Keith to stop using the word "nigger."

11. Keith looked Plaintiff in the eye and said "James, you are just going to have to get used to the "nigger" word.  There is nothing you can do about it."

12. Plaintiff interpreted Keith's statement to mean that Plaintiff should not complain about anyone at work using the word "nigger".

13. Keith was then promoted to a management position.  He is now a Foreman over a number of employees, including Plaintiff.

14. Keith became Plaintiff's direct supervisor.

15. The pain and fear suffered by Plaintiff prior to Keith becoming his direct supervisor was exacerbated because now Plaintiff was placed under racist Keith's direct supervision.  He knew Keith could have him fired if he complained about Keith's continued use of the word "nigger."

16. When Keith first used the word "nigger" in front of Plaintiff, Keith's direct supervisor, Andy Jordan, said nothing to either Keith or the Plaintiff.

17. Eventually Plaintiff complained to Andy Jordan. Jordan did absolutely nothing to stop the racist harassment of Plaintiff by Keith.

18. A black employee named Robert Boyd witnessed the "nigger" racist rant directed towards Plaintiff.

19. Boyd resigned in 2022 after he realized Defendant did nothing to stop the racist employees from continuing to call Plaintiff a "nigger lover."

20. Plaintiff, his wife, and his two adolescent children, have suffered severe emotional distress from the Defendant's tolerance of Defendant's employees calling Plaintiff a "nigger lover."

21. In 2022, one employee, Kevin, attempted to start a fight with Plaintiff although Plaintiff did nothing to provoke him. Kevin then approached Plaintiff and physically blocked Plaintiff from moving away from him. Kevin then yelled at Plaintiff stating "Come on. Let's go."

22. Plaintiff needed to get to work so he gently pushed Kevin aside. Plaintiff then went to work.

23. Later that day, racist Foreman Keith met with Plaintiff and attempted to issue Plaintiff a written disciplinary warning for touching the aggressor.

24. Keith had a second supervisor join the meeting. The second supervisor was named Kevin Jones and he is best friends and neighbors with Keith.

25. Plaintiff told Keith that Plaintiff only touched the aggressor in order to get by the aggressor and go to work. Keith insisted Plaintiff sign the written warning.

26. Plaintiff said he would only do so if Keith signed a statement that Keith used the word "nigger" in front of Plaintiff and also document that Keith threatened Plaintiff by telling Plaintiff that Plaintiff would " just have to get used to it" and "there was nothing Plaintiff could do about it."

27. Plaintiff's challenge to Keith to document all his racism in writing was made in front of the other foreman who was present, Kevin Jones.

28. Keith refused to document his racism.

29. Plaintiff clearly interpreted Keith's refusal to document his racism as a threat that if Plaintiff reported Keith's continued racial attacks, Keith would retaliate against Plaintiff by firing him.

30. Keith did not go forward with giving Plaintiff an unfounded, baseless, disciplinary warning.

31. In June, two employees came up to Plaintiff taunting him.  They said "Thank God for nigger day.  We get another day off."  This comment is referring to Juneteenth.  Plaintiff just ignored them and walked away.

32. In late summer, Upshur County transferred Plaintiff to a new location to work under an infamous supervisor who had been rumored to regularly fire employees.  The supervisor's name was Jody Buchanan.

33. Plaintiff was assigned to work with a black employee named Robert Boyd.  One day they needed to use shovels to perform an assignment.  They observed that there were three unused shovels in a truck at the facility.  They approached the truck and attempted to retrieve a shovel to perform their job.

34. Another employee named Cam Cochran came up to them and aggressively shouted "Don't grab that shovel."

35. Plaintiff responded that there were three shovels and he asked which shovel Cochran did not want them to take. Cochran just pointed at all three shovels and said, "that one." Plaintiff did not understand which shovel Cochran did not want them to take, so Plaintiff reached for one shovel and picked it up.

36. Cochran then yelled at Plaintiff, "Don't touch that shovel. I am going to beat your nigger loving ass over the head with it!"

37. Supervisor Phil Siegel, Foreman Michael Keith, and Foreman Jody Buchanan were all standing close to the truck clearly within earshot of Cochran's racist attack on Plaintiff, with black employee Boyd standing next to Plaintiff.

38. All supervisors remained silent and said nothing to Cochran, even though he screamed loud enough "I am going to beat your nigger loving ass" with shovel in hand.

39. About a week or two weeks later, supervisor Andy Jordan attempted to discipline Plaintiff. Jordan alleged Plaintiff falsified his timesheet. The allegation was not true. Plaintiff told Jordan he did not falsify any of his timesheets. Jordan did not go through with his attempt to discipline Plaintiff.

40. A few days later Jordan pulled Plaintiff into his office and asked Plaintiff what was going on. Plaintiff told Jordan that he was fed up with all the racial slurs he had been subjected to, with nobody in management doing anything to stop it. Plaintiff told Jordan he was tired of being called a "nigger lover."

41. Jordan dismissed Plaintiff's complaint by stating "Well you all have to work together, and you were going to have to deal with it."

42. Plaintiff responded "No, I am not going to have to deal with it."

43. Jordan then doubled down on his threat to Plaintiff, stating, "If you want to work here, you are going to have to deal with it."

44. Jordan threatened Plaintiff.  Jordan said that you have now worked at three of our four locations.  Barn 1, barn 2, and barn 3.  You are now at barn 4 and 4 is your last stop.  If you cannot make it work, then you are just going to have to go."

45. Jordan then threatened Plaintiff, stating "James, there is a perception about you that you do not want to work."

46. Plaintiff responded, "I have always done everything asked of me."

47. Jordan did not respond.

48. Plaintiff then said, "if anyone has accused me of not working it is those two supervisors who are down on me because of my wife."  Plaintiff was referring to both Keith and Buchanan.

49. Again, Jordan did not respond.

50. Thereafter, two employees, Michael G and Billy Albright, told Plaintiff that they were told to "keep tabs on him".  Albright then said "We gotta watch you like a hawk."  Plaintiff clearly understood that management directed these two employees to spy on Plaintiff and report any time they felt Plaintiff was not performing satisfactorily.  With two co-workers deputized by management to continually watch him, Plaintiff clearly perceived that management continued to try to find a reason to fire Plaintiff because Plaintiff asked management to stop the repeated racial harassment to which he was subjected to.

51. In February 2023, Senior Manager Phil Seigel assigned Plaintiff to operate a very large tractor with a very large "boom cutter" used to remove roadway brush. Plaintiff had no

training or prior experience operating this very large, unwieldy tractor. Siegel then threatened Plaintiff that if he did not quickly learn to operate the tractor Plaintiff "would be let go" for poor job performance.

52. Plaintiff understood this was another threat by Siegel to fire him even though Plaintiff had no training or experience with the very large tractor.

53. In February, Defendant's County Judge called Plaintiff into his office and asked Plaintiff about the racial harassment he had received. Plaintiff told the judge everything. The judge responded by stating that Texas was a "hire-fire" state, which Plaintiff interpreted as the judge threatening Plaintiff that he could fire Plaintiff for any reason at all.

54. The judge said he would follow up with Plaintiff regarding the "nigger lover" racism that he was being subjected to.

55. Plaintiff never heard back from the judge.

56. In February Plaintiff met with county human resources representative Maddie Moore ("Moore"). Plaintiff had just returned to work after recovering from a serious illness that kept him away for work for a few days.

57. Moore told Plaintiff he needed to submit an FMLA leave request form. She said the FMLA form would protect Plaintiff from being fired for absenteeism "with all that is going on."

58. Plaintiff interpreted her phrase "with all that is going on" to be a reference to the racism that Plaintiff faced, and management's goal to fire Plaintiff for complaining about being called a "nigger lover."

## **CLAIMS**

59. For his first cause of action, Plaintiff would show that he was subjected to discrimination by Defendant on the ground of race in violation of Section 1981. Plaintiff is accordingly entitled to recover his actual, compensatory, and punitive damages, prejudgment interest, attorney's fees and costs of court.

60. For his second cause of action, Plaintiff would show that he was subjected to retaliation by Defendant in response to his complaints of racial harassment in violation of Section 1981. Plaintiff is accordingly entitled to recover his actual, compensatory, and punitive damages, prejudgment interest, attorney's fees and costs of court.

61. Plaintiff demands a jury.

WHEREFORE, Plaintiff prays for all relief to which he is entitled.

Respectfully submitted,

*/s/ Christopher C. Antone*
Christopher C. Antone
State Bar No. 790186
cca@kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 379-0832
(214) 379-0840 telecopy

ATTORNEY FOR PLAINTIFF